IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| CMH MANUFACTURING, INC., d/b/a §<br>CLAYTON HOMES, and NTA, INC., §<br>§<br>*Plaintiffs*, §<br>§<br>v. §<br>§<br>HENSEL PHELPS CONSTRUCTION CO., §<br>et al., §<br>*Defendants*. § | Civil Action No.  SA-12-CV-1223-XR |

**ORDER**

On this date, the Court considered Plaintiffs' opposed motion to compel arbitration and stay the case.  Doc. No. 47 & Doc. No. 56.   After careful consideration, the Court GRANTS the motion.

**BACKGROUND**

In 2006, Defendant Hensel Phelps entered into a contract with the United States Army Corps of Engineers (the "Army") to design and construct modular military housing at Fort Bliss, Texas.  Hensel Phelps subcontracted many of its requirements to third parties.  This case arises out of the subcontract that Hensel Phelps awarded to the Warrior Group (collectively, the "Hensel-Warrior Agreements").  In turn, Warrior subcontracted with Fleetwood Homes of Texas, L.P. (collectively, the "Warrior-Fleetwood Agreements").   Fleetwood agreed to manufacture, assemble, and furnish the modular housing units for the Fort Bliss project.  Doc. No. 47, Ex. 2.  The Warrior-Fleetwood Agreements all contain an identical arbitration clause

that is the focus of this dispute. The clause provides that "[a]ny dispute between Warrior and Vendor (Fleetwood) not arising from or relating to the acts or omissions of the Owner (Army) shall be resolved through arbitration." Doc. No. 47, Ex. 1-C.

On March 10, 2009, Fleetwood Homes filed for bankruptcy. Plaintiff CMH purchased Fleetwood's modular housing production facility in Belton, Texas, and entered into a Warranty Assumption Agreement. Under this agreement, the rights and obligations that Fleetwood possessed under the Warrior-Fleetwood agreements were assigned to CMH. On January 1, 2011, the fire sprinkler pipes in five of the modular buildings manufactured by Fleetwood allegedly burst, causing significant damage to the housing units. The Army demanded that Hensel Phelps make repairs. Hensel Phelps passed this demand down to Warrior, who in turn passed it down to CMH. Warrior then withheld payment to CMH until the repairs were made. Doc. No. 47, Ex. I.

On March 1, 2012, CMH filed suit in this Court against Warrior, Hensel Phillips, and Travelers Surety Company of America to collect on the unpaid balance. Specifically, CMH sued under a breach of contract theory as well as for violations of the Miller Act. Defendants moved to compel arbitration on the basis of the aforementioned clause in the Warrior-Fleetwood Agreements. On June 22, 2012, this Court granted Defendants' motion and stayed the case under 9 U.S.C. § 3. *CMH Mfg., Inc. v. The Warrior Grp., Inc.,* No. 5:12-CV-001985-XR. Doc. No. 10. The arbitration related to the breach of contract claim is ongoing.

On December 28, 2012, CMH filed a second lawsuit in this Court against Hensel Phelps alleging that it negligently designed the sprinkler system that CMH was required by contract to install. In addition, in this second lawsuit, CMH alleges a cause of action for

negligent misrepresentation relating to the design specifications. Doc. No. 1. On September 13, 2013, CMH filed this motion to compel arbitration. Doc. No. 47.[1] Warrior, a defendant in the related case who actually signed the arbitration agreement, is not a party to this action. CMH only seeks to compel arbitration against Hensel Phelps and not against the remaining five Defendants.

A hearing on this motion was held on November 7, 2013. At the hearing, counsel for CMH represented to the Court that developments in the arbitration proceeding in the related case may make this motion to compel moot. Accordingly, the Court ordered counsel to provide a status report on or before January 6, 2014. In that report, CMH noted that the arbitration panel in the related case had not yet issued a ruling and that the issue was still pending. On March 1, 2014, CMH filed a second status report, noting again that the related arbitration is still pending. At this point, it does not appear likely that this motion to compel arbitration will be mooted by any timely developments in the ongoing arbitration in the related case. Accordingly, the Court turns to the merits of Plaintiffs' motions to compel arbitration.

## DISCUSSION

**1. Can CMH & NTA compel Hensel Phelps to Arbitrate?**

A motion to compel arbitration requires the Court to assess whether the parties agreed to arbitrate the dispute in question. "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418-19 (5th Cir. 2006) (quoting *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir.

---

[1] On December 18, 2013, co-plaintiff NTA, Inc., joined in CMH's motion to compel Hensel Phelps to arbitrate and stay this case. Doc. No. 56.

1996)). In addition, a court must ensure that there are no external legal barriers to enforcing an arbitration clause. *Id.* "Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law determines the scope of the arbitration clause." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077-78 (5th Cir. 2002).

*Is There an Enforceable Agreement Between the Parties?*

The arbitration clause that CMH seeks to enforce comes from its contract with Warrior, to which Hensel Phelps is not a party. Arbitration agreements are generally considered matters of contract law. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000). Accordingly, courts are hesitant to bind non-signatories unless there is a clear reason to do so. *See Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002). Federal courts applying Texas law[2] have compelled arbitration involving non-signatories when one of the following doctrines applies: (a) incorporation by reference, (b) assumption, (c) agency, (d) veil piercing/alter ego, (e) estoppel; and (f) third-party beneficiary. *Wood v. PennTex Res., L.P.,* 458 F. Supp. 2d 355, 362 (S.D. Tex. 2006) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001)).

The case law on this issue can be divided into two categories. The first category includes cases where the non-signatory seeks to enforce an arbitration agreement against a signatory. *Westmoreland,* 299 F.3d at 467. This was the situation in the prior action involving these parties where the non-signatory (Hensel Phelps) enforced this arbitration agreement against the signatory (CMH). Courts are clear that the standards for enforcing an agreement against a non-signatory are different than the standards for enforcing such an agreement

---

[2] State law applies to the question when a non-signatory such as Hensel Phelps can be bound. *Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 334 (5th Cir. 2010) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629 (2009)).

against a signatory. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003). In *Bridas*, the Fifth Circuit reasoned that "it is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Id.* at 361. Accordingly, the fact that Hensel Phelps once enforced this arbitration clause against CMH, although relevant, does not automatically mean that CMH can enforce it against Hensel Phelps.

CMH argues that Hensel Phelps can be compelled to arbitrate under a direct-benefit estoppel theory. Doc. No. 47. The Fifth Circuit has accepted direct-benefit estoppel as a basis for "compelling a non-signatory to arbitrate with a signatory to an agreement when the non-signatory 'knowingly exploits the agreement containing the arbitration clause.'" *Bridas*, 345 F.3d at 362 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc*, 269 F.3d 187, 199 (3d Cir. 2001)); *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006) (upholding enforcement of forum-selection clause against non-signatory on the basis of direct-benefit estoppel). Hensel Phelps counters with the argument that a non-signatory cannot be bound to an arbitration clause when they have not asserted a claim under that contract. Doc. No. 49.

In *Wood*, a federal district court in the Southern District of Texas applied direct-benefit estoppel to enforce an arbitration agreement against a non-signatory who was not asserting a claim under the contract. 458 F.Supp.2d at 355. *Wood* involved an arbitration clause contained in a stock purchase agreement between two companies. The owner and sole-shareholder of the seller later brought suit against the buyer. When the buyer moved to compel arbitration based on a clause in the stock purchase agreement, the plaintiff seller

argued that the clause did not apply to him personally because he was a non-signatory who was not asserting a claim under the contract. After finding that the sole shareholder, in his individual capacity, was not technically a party to the agreement containing the arbitration clause, the court applied direct-benefit estoppel to enforce the clause against him. *Id.* In doing so, the federal court relied heavily on the Texas Supreme Court's decision in *In re Weekley Homes,* 180 S.W.3d 127 (Tex. 2005) (holding that non-signatories may be bound even when not asserting a claim on the contract if they "deliberately seek and obtain substantial benefits from the contract itself.").

In *Weekley Homes*, a father entered into a contract with a home builder to construct a home for his adult daughter and her husband. The contract contained an arbitration clause. Later, the father and daughter sued the home builders who subsequently sought to enforce the arbitration agreement. The trial court enforced the agreement against the father only, reasoning that it could not apply to the daughter's claims because she was a non-signatory who was not asserting any claims under the contract. The Texas Supreme Court reversed on this issue. The court held that because the daughter had participated in the performance of the contract by making specific demands of the home builders, she had benefited from the agreement containing the arbitration clause and was therefore estopped from avoiding arbitration. *Id.* at 133. Specifically, the court reasoned that "when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later turn its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." *Id.* at 135.[3]

---

[3] More recently, in *Rachal v. Reitz*, the Texas Supreme Court extended *Weekley Homes* to compel arbitration against the beneficiaries of a trust containing an arbitration agreement. 403 S.W.3d 840 (Tex. 2013). The court focused its inquiry on whether the party seeking to avoid arbitration had derived benefit from the Trust. Finding that they had derived such a benefit, the Court applied direct-benefit estoppel even though there was no underlying contract.

In applying *Weekley Homes*, the court in *Wood* assessed whether the non-signatory had received substantial and direct benefits from the contract. In particular, the court found it relevant that the non-signatory: (1) participated in negotiating the agreement, (2) was named in the agreement, (3) was involved in the execution and performance of the agreement; and (4) was provided with indemnity under the agreement. *Id.* at 370.

Hensel Phelps directly benefited from the contract containing the arbitration agreement. Accordingly, direct-benefit estoppel applies and Hensel Phelps cannot avoid an obligation to arbitrate. As the prime contractor on a lucrative government contract, Hensel Phelps benefited financially from the execution of its subcontracts. Prime contractors utilize subcontractors to carry out their contractual obligations when it is economically beneficial for them to do so. Thus, a contractor in Hensel Phelps' position necessarily benefits from the performance of its subcontracts.

As to the factors identified in *Wood*, Hensel Phelps argues that there is no evidence of their role in negotiating the Warrior-Fleetwood Agreements. Doc. No. 49. The Court agrees with Hensel Phelps in the limited respect that the use of common language in both the Hensel-Warrior and the Warrior-Fleetwood Agreements does not establish that Hensel Phelps played a role in drafting the latter set of agreements. However, the Hensel-Warrior Agreements required Hensel Phelps' written consent before any of Warrior's obligations could be subcontracted to Fleetwood/CMH. Hensel Phelps was therefore on notice of the arbitration agreement contained in the Warrior-Fleetwood Agreements.

All of the other *Wood* factors point towards the application of direct-benefit estoppel. Hensel Phelps is named in the Warrior-Fleetwood Agreements. Doc. No. 47, Ex. 1-D. These

agreements also provide Hensel Phelps with indemnification for certain claims *Id.* Perhaps most importantly, Hensel Phelps was involved in the execution of the Warrior-Fleetwood agreements. The contract provided that Fleetwood was to "furnish and install piping and fittings . . . in accordance with [the designs] provided by *others*." *Id.* at 19 (emphasis added). The "others" referenced in the contract turned out to be Hensel Phelps. CMH alleges (and Defendants do not appear to contest) that CMH was required by the contract to use the sprinkler system designs provided by Hensel Phelps. Therefore, Hensel Phelps directly participated in the execution of the Warrior-Fleetwood Agreements by providing the sprinkler designs that are the subject of this lawsuit.[4]

Finally, and most importantly, Hensel Phelps has directly benefited from the arbitration clauses in the Warrior-Fleetwood Agreements. Hensel Phelps successfully moved this Court to compel arbitration against CMH in a prior related action. While this fact alone is an insufficient basis for CMH to compel arbitration against Hensel Phelps, it serves as a strong example of how Hensel Phelps has benefited from the Warrior-Fleetwood Agreements. As an equitable doctrine, the application of direct-benefit estoppel is at the court's discretion. Other courts have applied direct benefit estoppel when the non-signatory merely benefited from the contract in some manner unrelated to the arbitration clause. Here, however, the non-signatory has benefited from the arbitration clause itself. Accordingly, the Court finds that this is a rare situation where it is appropriate to enforce an arbitration agreement against a non-signatory.

    b. *Are the Claims Within the Scope of the Arbitration Agreement?*

---

[4] Hensel Phelps is therefore similarly situated to the non-signatory daughter in *Weekley Homes* who participated in the execution of the contract by imposing her own requirements on one of the parties.

CMH has asserted tort claims against Hensel Phelps for negligent design of the sprinkler system and negligent misrepresentation. Doc. No. 1. For arbitration to be appropriate, these claims must be within the scope of the arbitration clauses set forth in the Warrior-Fleetwood Agreements. Under federal law, which governs the scope of arbitration agreements, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

As an initial matter, however, the Court must determine who decides whether these claims are covered by the arbitration agreement. As a general rule, because arbitrators derive their authority from the arbitration agreement itself, determining the scope of that clause (i.e. arbitrability) is a task for judicial determination. *Tittle*, 463 F.3d at 419 (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)). At the same time, however, it is established that the parties have the power to determine by contract whether the court or the arbitrator decides arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). On this issue, the Supreme Court has instructed courts not to assume that the parties agreed to arbitrate arbitrability "[u]nless the parties clearly and unmistakably provide otherwise." *AT&T Techs.*, 475 U.S. at 649. In the Fifth Circuit, adoption of the American Arbitration Association ("AAA") Rules "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcdermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). The arbitration clause in the Warrior-Fleetwood Agreements expressly incorporates the AAA rules. Accordingly, it appears as though the parties intended for the arbitrator to decide his or her own jurisdiction.

However, in a case where the arbitration agreement is being enforced against a non-signatory, the Court finds it appropriate to ensure that the claim falls within the scope of the arbitration agreement. The agreement here provides, in pertinent part, that "any dispute between Warrior Group and Vendor not arising from or relating to the acts or omissions of the Owner shall be resolved through arbitration." Doc. No. 47, Ex. 1-D. The contract defines the "owner" to be the Army. The claims here do not pertain to any Army acts or omissions. Instead, they solely relate to the acts or omissions of Hensel Phelps and the other Defendants.

Hensel Phelps argues that these claims are unrelated to the contract. Doc. No. 49. There are two problems with this argument. First, the tort claims are in fact related to the underlying contract. The contract containing the arbitration clause required CMH to use a certain sprinkler system designed by Hensel Phelps. Whether Hensel Phelps was negligent in designing this sprinkler system therefore directly relates to CMH's performance of the contract. More importantly, the arbitration clause refers to "any dispute" between the parties. Unlike some arbitration clauses, it is not expressly limited to claims arising out of the contract. Accordingly, the claims in this case fall within the scope of the arbitration agreement. Finally, the parties have not alleged the existence of any independent impediment to compelling arbitration.

**2. Can the Case be Stayed Against the Other Non-Signatory Defendants?**

While the Court has authority to compel Hensel Phelps to arbitrate as discussed herein, this does not apply to the other five Defendants in this case. None of these other parties were signatories to the arbitration agreement. Unlike Hensel Phelps, direct-benefit estoppel does not apply to these other Defendants. CMH has not established how these parties benefited

from the contract containing the arbitration agreement. Accordingly, the Court lacks authority to compel arbitration against the remaining Defendants.

However, under § 3 of the FAA, this Court retains discretion to "stay all litigation between signatories and non-signatories pending completion of arbitration to prevent the litigation from undermining the arbitration." *Halliburton Energy Services, Inc. v. NL Indus., Inc.*, 2006 WL 3949170 (S.D. Tex. July 25, 2006); *see also Moses H. Cone,* 460 U.S. at 103 ("[i]n some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration."). At the November hearing on this motion, the Court questioned whether staying the case while CMH and Hensel Phelps arbitrated would unfairly prejudice the other five Defendants. At the hearing none of these parties indicated that they would be unfairly prejudiced by a stay pending resolution of the arbitration. Likewise, in the intervening months none of these parties have indicated their opposition to a stay. Accordingly, the Court exercises its discretion to stay the case.

## CONCLUSION

In light of the foregoing analysis, Plaintiffs' motion to compel arbitration is GRANTED as against Hensel Phelps. Doc. No 47, Doc. No. 56. The case is hereby STAYED pending resolution of the arbitration proceedings. The Clerk is directed to ADMINISTRATIVELY CLOSE the case until further notice. The parties are ORDERED to provide the Court with status updates every six months from the date of this order on the status of arbitration.

SIGNED this 5th day of March, 2014.

                                               XAVIER RODRIGUEZ
                                               UNITED STATES DISTRICT JUDGE